UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————
                                                )
UNITED STATES OF AMERICA,                       )
                                                )
v.                                              )
                                                )         Criminal Action
ERIC L. LEVINE, J. DANIEL LINDLEY,              )         No. 08-10121-GAO
ERNST APPOLON, DANIEL APPOLON and               )
LATOYA HALTIWANGER,                             )
                                                )
              Defendants.                       )
—————————————————————)

## MEMORANDUM IN SUPPORT OF DEFENDANT ERIC L. LEVINE'S MOTION TO VACATE AND SET ASIDE JUDGMENT PURSUANT TO 28 U.S.C. § 2255

### I. INTRODUCTION

This Court conducted a closed hearing on May 19, 2010 – during the trial of this case – to inquire into suspicions of a romantic relationship between Melanie Abbruzzese, a key member of defendant Eric Levine's defense team,[1] and Joseph McGonagle, the U.S. Postal Inspector who was part of the government team preparing for and trying the case. Both Ms. Abbruzzese and Mr. McGonagle denied under oath that they were involved in a romantic relationship at the time, or that they had discussed confidential information concerning the case. On that basis, the Court and Mr. Levine were satisfied that there were no improprieties relating to Ms. Abbruzzese's conduct that undermined his representation or impugned the integrity of the trial, Affidavit of

_____

[1] Ms. Abbruzzese is a law school graduate but not a member of the Bar. As such, she was not conducting the trial on behalf of Mr. Levine. As will be shown, however, she played a critical role in his defense and in the trial of the case. Indeed, until after the commencement of the trial, Mr. Levine understood she was a licensed attorney. Affidavit of Eric L. Levine ("Levine Aff.") at ¶ 8 (attached as Exhibit A).

Eric L. Levine ("Levine Aff.") at ¶ 15 (attached as Exhibit A), and the trial proceeded to its conclusion on June 2.[2]

Since the trial concluded, however, persuasive new evidence has come to light which demonstrates that Ms. Abbruzzese and Mr. McGonagle each lied under oath on May 19, that they were engaged in a romantic and intimate relationship when they testified to the contrary, that they discussed sensitive and confidential matters concerning the case during the trial, and that Mr. Levine's trial counsel failed to disclose to him their knowledge or belief that such relationship was taking place during the trial.  As a result of this apparent conflict of interest, trial counsel from the firm of Denner Pellegrino ("DP") withdrew from Mr. Levine's representation (with leave of court) after undersigned counsel entered their appearance on August 10, 2010.

In light of the new evidence that his representation was infected by a conflict of interest arising out of the Abbruzzese-McGonagle relationship, that the principals defrauded him and the Court by lying under oath about it, and that his trial team covered-up and concealed this information from him,  Mr. Levine now asks the Court to vacate and set aside his Judgment and sentence pursuant to 28 U.S.C § 2255.[3]

---

[2]  Mr. Levine was found guilty of 61 counts.

[3] Before his sentencing, Mr. Levine filed only a Motion for an Evidentiary Hearing based on these facts, and requested no relief.  The motion contended that the defendant was entitled to an evidentiary hearing in order to obtain further evidence and determine what relief he was entitled to.  Other than the evidentiary hearing, the motion did not request any relief.  Initially the Government did not object to a limited hearing.  See Government's Response to the motion (10/8/10), at pp. 1-2.  The court denied the motion on November 15, 2010.  It should be pointed out that this Memorandum in support of Mr. Levine's current motion under § 2255 incorporates verbatim the factual recitation in the earlier Memorandum.  However, we proceed now – unlike in the earlier motion – to show not only the evidence supporting the romantic relationship between the two protagonists, but also the reasons they now entitle Mr. Levine to have his Judgment and sentence vacated and set aside based on the standards for § 2255 relief; relief that was not available to him before his sentencing.  Thus, the current motion is entirely distinct from the previous one, and any suggestion by the government that the court's denial of the earlier request for an evidentiary hearing is dispositive of the current motion is well wide of the mark.

## II. ROLES PLAYED BY ABBRUZZESE AND MCGONAGLE IN PREPARATION AND TRIAL OF THE CASE

Melanie Abbruzzese is a law school graduate.  See Jennifer Garrity 8/31/10 Transcript (attached as Exhibit B) at 5.[4]  She started at Denner Pellegrino ("DP") in 2008 or 2009, Kellie Cerulli 8/31/10 Transcript (excerpts attached as Exhibit C) at 5, and was heavily involved in the Levine defense beginning in or around October 2009.  See Transcript of 5/19/10 Hearing (attached as Exhibit D) at 19-20.   The lead counsel for Mr. Levine's defense team, Isaac Borenstein, made Ms. Abbruzzese responsible for pre-trial preparation.  Levine Aff. (Exhibit A) at ¶¶ 1, 5.  She occupied a position of unique responsibility on the defense team, as evidenced when Mr. Borenstein told Mr. Levine and his family before trial that Abbruzzese was the most important member of the team, and that he could not try the case without her.  Id. at ¶ 4.[5] Although not licensed to practice law, Abbruzzese played a critical role in all aspects of the Levine defense.  Mr. Levine had known her from a previous job that she held at another law firm (Harmon and Associates), where she had done real estate work, and, where she had gained substantial experience from her foreclosure work there about issues that were relevant to the case, e.g. lender practices, mortgages, and closing procedures.  Id. at ¶ 2.  As a result, Mr. Levine had great faith that her experience and expertise in real estate law and practice would be a valuable asset to his defense.  Id.  Abbruzzese was intimately involved in preparing the case for trial and in helping to make the tactical decisions leading up to and during trial.  Id. at ¶ 1.

---

[4]   Sworn testimony of five Denner Pellegrino employees was taken by undersigned counsel on 8/31/10.  Transcripts of the two that are most significant for present purposes – Jennifer Garrity and William Ford – are attached as Exhibits B and E.  They will be referred to as "8/31 Garrity [or Ford] Tr. at  [page] ."  Earlier, unsworn testimony of Garrity and Ford was taken by prior counsel for Denner Pellegrino on July 22, 2010.  To the limited  extent that the earlier unsworn testimony is referred to, it will be referenced by that 7/22 date, and the particular excerpt will be attached as an exhibit.  The full transcripts of the unsworn 7/22 testimony were previously provided to the Court and the government on July 26, 2010.

[5]   The defendant does not waive, and expressly preserves, the attorney-client privilege.

Levine worked by far more closely with her than any other member of his defense team, interacting far less frequently with attorneys Isaac Borenstein, Bruce Levin, and Rachel Berk (who was on and off the defense team but present for the early parts of the trial).  Id. at ¶ 3. Levine met with Abbruzzese virtually every day, and he believed that she knew and understood the case the best of all the members of his defense team.  Id. at ¶ 5.  She was by far the most familiar with the documents and exhibits in the case, and attorneys Borenstein and the rest of the DP legal team were dependent on her knowledge of the documents, and relied on her to identify, organize, and analyze the key documents to be used in cross examination of government witnesses, and to be offered into evidence on behalf of Mr. Levine.  Id. at ¶ 7.  By virtue of the depth of Abbruzzese's knowledge and understanding of the case, Levine believed throughout the pretrial period that she was in fact a member of the Bar.  Id. at ¶ 8.  It was only after the commencement of trial that Levine learned that, while Abbruzzese was a law school graduate, she was not a member of the Bar (and hence could not sit at counsel table during trial).  Id.

Joseph McGonagle was the U.S. Postal Inspector, and a member of the Financial Crimes Task Force, who joined the government's investigative and prosecutive team when Inspector Paul Durand retired in 2008.  Id. at ¶ 9.  McGonagle was the person assigned by the prosecution team to maintain the voluminous records in the case at the U.S. Postal Service, and to coordinate the inspection of these documents with the defense.  Id. at ¶ 10.  On numerous occasions, beginning in approximately December 2009, Levine went to that building with Abbruzzese to review records.  Id. at ¶ 11.  On each of these occasions, McGonagle was present to monitor and oversee the defense's review of them.  Id.  Levine understood from Abbruzzese that she was coordinating each such visit with McGonagle.  Id.  McGonagle was part of the government's trial team, was present in court every day of trial, maintained and ran the computer which

organized, controlled, and displayed the exhibits in the case, and otherwise participated in the government's preparation and presentation of the case at trial.  Id. at ¶ 12.

Abbruzzese sat in the first row behind McGonagle during the trial.  Id. at ¶ 13.  She was very actively involved in the preparation for trial and the organization of questioning and evidence for trial presentation, as well as participating in tactical and strategic decisions before and during the trial through early May 2010.  Id. at ¶ 1.  Levine confided in Abbruzzese far more than any other member of the defense team, and came to rely on her judgment and advice – due to her superior knowledge of the case – more than any other member of the defense team.  Id. at ¶ 5.  As far as he was concerned, Abbruzzese was the "glue that held the defense team together," and she was the key member of the team in terms of preparing the case and understanding it fully.  Id. at ¶ 6.

### III.  **THE MAY 19, 2010 HEARING**

We know that by at least early May, 2010, Mr. Levine's trial lawyers were aware of a relationship between Abbruzzese and McGonagle.  That is based on what Levine's lead defense counsel, Isaac Borenstein,  told the Court in the hearing before the trial day began on May 19, 2010:[6]

> [A]bout two weeks ago I learned that they [Abbruzzese and McGonagle] were having some kind of friendly relationship between the two of them. I didn't know the depth of it.  The impression that was left with me, frankly, my state of mind was he liked her; they were exchanging <u>personal information</u>, <u>phone numbers</u>, <u>emails</u>.  And I went to Ms. Abbruzzese and said, <u>"This is not appropriate.  You should not be having a relationship with him.  Let's stop that."</u>
>
> I probably should have done more.  I probably should have let Mr. Wild know at the moment, at the time; I probably should have said to her, "You're going to get fired if I hear anything else."  I didn't go that far,

---

[6]  This was a closed hearing that took place in the Court's chambers, and at which Mr. Levine was not present. Second Affidavit of Eric L. Levine ("Levine Second Aff.") at ¶ 2 (attached as Exhibit E).

and that was my mistake.

5/19 Chambers Hearing Tr. (Exhibit D) at 5 (emphasis added).  It is important to note that

neither Attorney Borenstein nor anyone else on the defense team or at Denner Pellegrino had

ever advised Levine of any of this information, or of their observations, suspicions, later

confirmed, that they had obtained around May 5 concerning a relationship between Abbruzzese

and McGonagle.  Levine Aff. (Exhibit A) at ¶ 14.  Even on May 19, 2010, Mr. Borenstein told

Levine he was concerned only about an exchange of emails the night before and nothing more

regarding the history of his knowledge and suspicions of a relationship.   Second Affidavit of

Eric L. Levine ("Levine Second Aff.") at ¶ 5 (attached as Exhibit E).[7]

Then, as Attorney Borenstein further elaborated to the Court in chambers on the morning

of May 19 hearing:

> [A]t about eleven-something last night I got an email from my assistant,
> Melanie Abbruzzese… – that she had just – I thought she had emailed him
> – that she had just had a phone conversation with Mr. McGonagle . . .
> and that he shared with her that Mr. Wild had just sent an email to his staff
> indicating our witnesses and that Mr. Levine may testify in the case.
>
> I was extremely disturbed at hearing that Melanie and Mr. McGonagle
> were having these conversations outside – about the case outside of office
> hours.  So I told her this morning that I was going to bring this to the
> attention of Mr. Wild, and the Court, if necessary . . .
>
> When I learned last night that this had happened, I felt like it had just
> crossed all boundaries . . .

5/19 Chambers Hearing Tr. (Exhibit D) at 4-5.

Attorney Borenstein advised the Court further that, on the morning of the May 19

hearing:

> I had a further conversation with her and made it very clear: "Absolutely

---

[7] The affidavit attached to this memorandum is unsigned.  Undersigned has sent a copy of the affidavit to Mr.
Levine for his signature, and will supply it to the Court promptly.

> nothing.  I don't want any contact whatsoever.  She got extremely
> upset this morning because she felt like Mr. McGonagle will be treated
> unfairly; this is unnecessary, this was just friendly chat, whatever;
> don't make this bigger than it is … <u>and then [later] told me that she</u>
> <u>told Mr. McGonagle and informed him that I was going to bring it to</u>
> <u>the attention of the Court.</u>

<u>Id.</u> at 8 (emphasis added).

This was corroborated by Assistant U.S. Attorney Victor Wild, who advised the Court

that McGonagle "apparently" saw the email (about the defense witness list) the evening before.

Then AUSA Wild said:

> He tells me this morning he received a phone call from her and that
> they just talked, and somehow or other the topic of . . . at least the
> potential for Mr. Levine testifying was discussed between them.

<u>Id.</u> at 6.  Although McGonagle denied any romantic relationship with Abbruzzese,[8] AUSA Wild

"immediately instructed him that he is not to have any further contact of any kind with her for

any purpose."  <u>Id.</u> at 7.

Based on these revelations by Mr. Borenstein in chambers at the beginning of the trial

day on May 19, the Court conducted a closed evidentiary hearing in the courtroom at the end of

the trial day.  At the hearing Abbruzzese testified that she had worked on Levine's case since

October 2009.  <u>Id.</u> at 19-20.  She said that she and McGonagle had first met before the trial

started (on April 5) in connection with the case, but that she and he had "never" discussed any

issues about the case either before the trial started or during the trial.  <u>Id.</u> at 20.  Nor, she said, did

she divulge any attorney-client privileged information to McGonagle, or to anyone else.  <u>Id.</u> at

26-27.  When asked about the previous evening's conversation with McGonagle, Abbruzzese

said that she was uncertain about the time, but that she called him somewhere between 9 and 11

---

[8] McGonagle told AUSA Wild that he and Abbruzzese had "not had anything beyond friendly chats . . . they haven't done anything and they haven't met otherwise in any places . . ."  <u>Id.</u> at 7.

PM.  Id. at 21.  When asked why she raised the defense witness list with McGonagle, she

responded, "[b]ecause I think I had just said, 'Oh, I'm exhausted,' because . . . I didn't leave

work until around seven because I was working on the witness list."  Id. at 22.  They "talked a

little bit more, but on a completely different subject,"[9] and then McGonagle said that he just got

the witness list and it says "Eric Levine may or may not testify."  Id.  She said that was the

extent of the discussion.  Id. at 23.  When asked what prompted her to call McGonagle the

evening before, she responded:

> . . . I'm not even sure.  I know there was the issue that I had been
> checking my email, but we were in court all day.  And it's just very,
> you know, informal.  If anything, "Have a good weekend,"[10] like I
> say to anyone . . . I called and – or I had received a voicemail and I
> just called him back.

Id. at 24.

Abbruzzese acknowledged they had each other's cell phone numbers in connection with

the case, id. at 23, but she testified that the evening before was the only time she called him from

her own phone to his phone, as opposed to from her office to his.  Id. at 25.

Abbruzzese testified that she had met McGonagle on some occasions at the U.S. Postal

Service in connection with the discovery before trial.  Id. at 24.  But on the subject of any social

meetings with him, Abbruzzese was emphatic in response to questioning from AUSA Wild:

> Q:     And have there been any social out-of-office meetings between
>        you and McGonagle?
>
> A:     No.
>
> Q:     On any occasion?
>
> A:     Never.

---

[9] There was no inquiry into the substance of this "completely different subject" they discussed.

[10] This conversation took place on the evening of Tuesday, May 18, 2010.

> Q:     Lunches in the building?  Anything?
>
> A:     Never.

<u>Id.</u>

McGonagle was equally emphatic on that point.  After testifying in response to AUSA Wild's questions that they had dealings in connection with the government's production of discovery, <u>id.</u> at 28, he testified as follows:

> Q:     In any of the course of that were any of your meetings social and personal with her?
>
> A:     No.
>
> Q:     Were they all of a professional nature on your behalf and hers?
>
> A:     Yes …
>
> Q:     And have you had any social, out-of-office or out-of-court, meetings with her?
>
> A:     No.
>
>
> Q:     Have you had any private, personal meetings with her that did not relate directly to the professional duties you have in connection with the case?
>
> A:     No, I have not.

<u>Id.</u> at 28-30.

McGonagle also denied ever disclosing to Abbruzzese any privileged or confidential matters about the government's case.  <u>Id.</u> at 30.  As for the telephone call the evening before, he said he "may have" called her earlier in the evening, and she was busy and on her way home, and said she would call him back.  <u>Id.</u> at 29.  As to what would have prompted him to call (if he did), he claimed:  "Just to say hello.  I hadn't talked to her for awhile."  <u>Id.</u>  When she called back

9

later they were "talking on an unrelated topic,"[11] when he received the email regarding the

defense witness list from Levine's counsel.  <u>Id.</u> at 30.

> And as I was scrolling through it, I saw Mr. Levine's name, and I
> was kind of surprised because I didn't expect him to be testifying,
> frankly, since none of the other defendants plan on testifying.
>
> So I kind of said matter-of-factly, "Wow, I just got the witness list and
> we're not sure if your client is going to testify or not."  And that was the
> extent of it.

<u>Id.</u> at 30-31.

McGonagle claimed that Abbruzzese responded:  "Yeah, I guess you'll find out in a day

or two, whenever we're required to disclose it, but …"  <u>Id.</u> at 31.  He testified that they had no

further discussion about whether Levine would testify or about the case; the rest of their

conversation was "of a friendly matter and of a more personal matter" between the two of them.

<u>Id.</u>  The only specification of the subject matter of this discussion was that by "personal" he

meant of a "friendly" nature.  <u>Id.</u>  Attorney Borenstein had no questions for McGonagle after

AUSA Wild concluded his questioning.

At the conclusion of the hearing, the Court determined, based on their testimony, that

there did not appear to be any breach of confidentiality between Abbruzzese and McGonagle.

<u>Id.</u> at 32-33.  In reliance on their testimony, and lacking any knowledge of the strong suspicions

his trial counsel had held for two weeks about the relationships – or the basis for those suspicions

– Levine agreed to continue the trial with his then-defense team.  Levine Aff. (Exhibit A) at ¶ 15.

Had they testified truthfully, or had Mr. Levine been apprised of the relationship, he would have

objected to the conflict before the trial proceeded.  Levine Second Aff. (Exhibit E) at ¶¶ 11-12.

---

[11] As was the case with Abbruzzese's testimony, there was no inquiry about the nature or substance of this
"unrelated topic."

We turn now to the evidence that has been obtained since the conclusion of the trial which belies the core testimony of Abbruzzese and McGonagle that their relationship during the trial (up to May 19) was strictly professional, and that they did not see each other socially, outside of the office, during that time.  In refuting this testimony, the newly discovered evidence also casts serious doubt on the entirety of their sworn testimony.  The evidence obtained also reveals that Levine's trial team was tainted by a conflict of interest as a result of the Abbruzzese-McGonagle relationship; that the taint was exacerbated by the knowledge on the part of that team – and others at DP – of the relationship; and that Levine's lawyers covered-up that relationship from Levine.

## IV.  POST-TRIAL EVIDENCE OF THE ABBRUZZESE-MCGONAGLE RELATIONSHIP

Abbruzzese abruptly resigned from her position at DP on July 20 or July 21, 2010.  Cerulli 8/31 Tr. (Exhibit C) at 17-18.  Abbruzzese's sudden and unexplained departure triggered a lunchroom conversation about her the same day, in which Garrity and other DP employees participated, and which included some discussion about Abbruzzese's relationship with McGonagle.  8/31 Garrity Tr. (Exhibit B) at 47-54.  Jeffrey Denner, one of the named partners of DP, having heard about this discussion, pulled Garrity out of the room to discuss what she knew about the relationship.  Id. at 54-56.  Attorney Denner and others at his firm arranged to take the unsworn testimony of William Ford and Garrity before a court reporter on July 22.  Undersigned counsel took their sworn testimony, and that of three other DP employees, about the Abbruzzese-McGonagle relationship, on August 31.  The evidence about the relationship emerged largely through the testimony of DP employees Ford and Garrity, which is summarized below.

A.   **Testimony of William Ford**

Ford, a personal assistant to Attorney Denner, see William Ford 8/31/10 Transcript (Exhibit F) at 5, became somewhat friendly with Abbruzzese beginning in the winter of 2009-2010.  Id. at 7-8.  He testified to numerous conversations with Abbruzzese about her relationship with McGonagle, testimony that clashed with both Abbruzzese's and McGonagle's sworn testimony on the subject at the May 19 hearing.  None of the information which was known to Ford was ever disclosed to Mr. Levine.  Levine Second Aff. (Exhibit E) at ¶ 14.

Ford testified that he also knew Abbruzzese's purported boyfriend/fiancée at the time, Joseph Feretra, with whom she often stayed in Winthrop.  8/31 Ford Tr. (Exhibit F) at 8-9 (Exhibit E).  Because Ford also lived in Winthrop, close to Feretra, Ford sometimes drove into work or back from work with both Feretra and Abbruzzese, and on those occasions would go into Feretra's apartment to meet them for the ride.  Id. at 9, 13-14.

One such occasion resulted in Ford's learning for the first time in March 2010, from Abbruzzese, about her relationship with McGonagle.   Ford recalled this incident occurring around the time he hurt his back in March 2010.  Abbruzzese called him at home one morning from Feretra's and said she was driving in early and asked if he wanted a ride to work.  Id. at 11-13.  He said yes, and walked to Feretra's apartment, which was down the street from his.  Id. at 14.  While waiting for Feretra, he observed Abbruzzese sitting at Feretra's computer typing an email on her personal account.  Id. at 15-16.  Ford looked at the screen and was able to see the email she was typing, and some of the  email trail that preceded it.  Id. at 12, 16-17.  The first email on top was one in which "she was basically complaining that due to financial reasons, Team Levine was being cut back and she was being told she wasn't going to be allowed to go to trial."  Id. at 16-17.  While he didn't remember the exact terminology, "it appeared to be her

venting to someone who seemed to be a friend in the initial e-mail." Id. at 20.  He recalled

Abbruzzese, in this email, saying "this is such bullshit.  I'm being pulled off the case.  I did all

the work." Id. at 21.  He recalled a preceding email to Abbruzzese which said, "that sucks.  I'm

going to miss seeing you in court." Id.  He also recalled Abbruzzese responding to the other

person's email stating "I am going to miss seeing you in court every day, I am going to miss

looking at the back of your head." Id. at 30-31.

Ford did not recall seeing the name or email address of the other person with whom

Abbruzzese was corresponding. Id. at 19.  However that day, he had a brief conversation with

Abbruzzese in Feretra's apartment about this other person, which conversation they continued

after Feretra dropped them off at work. Id. at 22.  At the apartment, when Abbruzzese noticed

that Ford had seen the email, she said "I met this guy over there and he's been hitting on me." Id.

at 12.  She told Ford that he was a federal agent. Id.  Ford commented to Abbruzzese about how

her email was so "out in the open and from his [Feretra's] own computer." Id. at 22.  Although

Feretra had given Abbruzzese an engagement ring, Ford "knew how 'not' serious she was in her

relationship" with Feretra. Id. at 22.[12]

After Feretra dropped them off at work, Ford resumed the conversation:  "who was that

to?  You're seeing somebody else in the case.  What was that about?" Id.  Abbruzzese replied:

"no, I met a guy, I'm kind of talking to him.  He's a nice guy." Id. at 22-23.  And she further

said: "yes, I've met this guy.  I met him doing discovery.  He's been flirting with me." Id. at 32.

Although Ford did not learn the name of the individual at this time, he knew "it was somebody

she had to see in court." Id. at 23.  Ford later learned, from conversations with both Abbruzzese

and Feretra, that the individual's name was Joseph McGonagle. Id. at 24-25, 47.

---

[12] Abbruzzese would take the engagement ring off when she was not with Feretra. Id. at 62-63.

Ford had further conversations with Abbruzzese shortly after the trial started (which was on April 4, 2010) about her relationship with McGonagle.  Abbruzzese said the relationship had started as a flirtation friendship but she had then moved to dating him and seeing him socially. Id. at 32-34, 41-42.  She said that they had lunch and that she had seen him outside the courtroom once or twice.  Id. at 34.  One time she told Ford that during the trial she and the agent went out and had drinks after the trial recessed.  Id. at 37.[13]  "She said she went out and had lunch and drank with the guy." Id. at 39, 41.  At the beginning of May, Abbruzzese told Ford that she had started to see the federal agent a lot more frequently.  Id. at 43.  Abbruzzese told Ford "they were dating and that she liked the guy an awful lot." Id. at 52-53.

When asked if Abbruzzese told him that she and McGonagle were having a sexual or intimate relationship, Ford responded:  "She made it crystal clear that they were very close." Id. at 56-57.  On "more than a handful of times" Ford saw Audi keys on Abbruzzese's ledge, which he understood belonged to the federal agent she was seeing.  Id. at 55.  Abbruzzese didn't have a car herself.  Id. at 56  The last such time he saw the agent's Audi keys with her in the office, and thus knew the relationship was still going on, was in her last week in the office.  Id. at 84-85. Abbruzzese quit on July 20 or 21.

Ford testified about actually seeing Abbruzzese and McGonagle together outside the courtroom on two occasions.  He recalled explicitly that one of those occasions took place on May 13, 2010 because that was the date of Game Six of the Celtics-Cleveland Cavaliers playoff series, which the Celtics won to clinch the series.  Id. at 63; see also Wikipedia entry

---

[13] Ford suspected that she went out with McGonagle several other times after the trial had recessed for the day because the attorneys would return to the office and she did not.  Id. at 37.  "Since I knew from her that she was at least friendly with the guy, and had at least on one occasion that she had told me about gone out and had lunch with or hung out with him after the trial had recessed, I assumed that she was probably doing that far more frequently." Id. at 37.  Feretra would frequently call Ford looking for Abbruzzese and inquiring whether she would still be at the federal courthouse at, for example, 6 p.m.  Id. at 38. Feretra implored Ford:  "Who is the fed? . . .  This fucking fed won't leave her alone."  Id. at 36.

documenting May 13 as the date of that game (attached as Exhibit G).  On the day of the game or the day before, Ford told Abbruzzese that he had gotten a ticket to that game.  8/31 Ford Tr. (Exhibit F) at 65.  Abbruzzese later told Ford that she had lied and told Feretra that she was also going to the game with Ford, and asked Ford to tell Feretra that she was going with him, which Ford agreed to do.  Id. at 65-68.

Ford told Abbruzzese that she should meet him back at the office after the game and he would drive her home (to Feretra's apartment).  Id. at 68-69.  As pre-arranged, after attending the game alone, Ford returned to the office building at which DP is located, but Abbruzzese was not there.  Id. at 69. He waited in front of the building for her, and saw a dark colored (dark gray, black, or blue) 4-door A4 Audi Quattro pull in and park in the circle in front of the building.  Id. at 70-71.  He saw Abbruzzese in the car talking to someone else while the car was parked.  Id. at 71.  He called Abbruzzese on her cell phone, then saw them continue to talk, "[t]hen I saw them kissing each other."  Id. at 71-72.  Then the car pulled up to the front of the building and she got out.  Id. at 72.  He could see the man she was with in the car, but not well.  Id. at 73.  As they walked to the garage to get the car in which they would drive home, Ford thinks he asked her, "was that him?", and she said yes.  Id. at 74.  By "him," Ford understood her to mean the federal agent she was seeing.  Id.  There was no question in his mind that this took place on May 13, because that was the date of the Celtics-Cavaliers game he attended.  Id. at 74.  He then drove her home to Feretra's apartment.  Id. at 67.

On another occasion, near the end of the trial or after it had concluded (which was June 2), Ford bumped into Abbruzzese and McGonagle when he went to a convenience store in Winthrop Center.  Id. at 75.  He saw her at the store, and "saw her and the guy in the car."  Id. at 76.  It was the agent's car, the same Audi that he had seen Abbruzzese in on May 13.  See

William Ford 7/22/10 Transcript (Exhibit H) at 10.[14]  Abbruzzese offered him a ride home, which Ford accepted.  8/31 Ford Tr. (Exhibit F) at 76.  Abbruzzese introduced the two of them, and the other man introduced himself as "Joe."  Id.  Ford described him as having curly red hair, pale, "Irish looking."  Id. at 77.  He believed this was the same guy he had seen Abbruzzese kissing on May 13.  Id. at 78.  Ford had been asked (not under oath) in the initial questioning by Levine's prior counsel on July 22 how certain he was that the guy he had seen Abbruzzese kissing in the car on May 13 was the same person he met with her on this occasion in Winthrop Center, and he had responded then:  "A hundred percent.  No doubt whatsoever."  7/22 Ford Tr. (Exhibit H) at 15.[15]  Abbruzzese confirmed to Ford the following day that the man he had met in the car the day before was in fact the federal agent she had been seeing.  8/31 Ford Tr. (Exhibit F) at 79.

Both Abbruzzese and Feretra told Ford about a confrontation during the trial between Feretra and McGonagle.  Abbruzzese told him that she had been out with the federal agent, and that Feretra believed that she was still coming back from the trial and he was coming to pick her up at the office.  Id. at 45-46.  "Since the trial had recessed at two and she wasn't actually in the office, she had had the guy [the agent] drop her off around the side door, around the back of the building."  Id.  Abbruzzese told Ford that Feretra had parked around the side of the building waiting for her, and when she got out of the agent's car, Feretra's truck came racing up towards her.  Id. at 46.  "She said that she started motioning for the federal guy to drive away" because she "understood the confrontation that was about to happen."  Id.

---

[14] A 2005 Audi A6 (4-door, black) is listed in the records of the Registry of Motor Vehicles as registered to Joseph M. McGonagle, III of 134 High Street, Danvers, MA.  See Exhibit I.

[15] Ford backed away from this somewhat in his 8/31 sworn testimony, saying he couldn't be 100 percent certain. 8/31 Ford Tr. (Exhibit F) at 78.  But when asked if there was any doubt in his mind that it was the same person, he responded "[n]ot really.  I think that's who it was."  Id. at 79.

As the federal agent started to drive away, Abbruzzese said, Feretra cut him off, got out of the car, and started screaming and swearing at him to stay away from his girlfriend.  Id. Confronted with this threat, McGonagle placed his hand on his gun.  Id. at 46-47.  Ford continued:  "And her story to Joe McGonagle, Federal Joe, her story to that guy, the nice federal agent that had been courting her, was that the lunatic banging on the hood of his car screaming stay away from my girlfriend was in fact her crazy uncle."  Id. at 47.

Feretra told Ford "the same story, a little more colorful.  Few more curse words."  Id. at 48.  Ford characterized Feretra as having become increasingly suspicious of Abbruzzese: "She is not there as much.  He's dumb, but you don't have to be too bright to know they are still not at trial at seven o'clock on a Friday night when it's 85 degrees out."  Id.

During the trial, Abbruzzese and McGonagle discussed sensitive, highly confidential matters pertaining to the case, information that should ordinarily not have been broached between adversaries.  It is important to note that in light of the critical position she occupied on the defense team, Abbruzzese had full access to confidential defense materials, was present at the critical strategy meetings of the defense team, and participated actively and aggressively in those sessions.  Levine Second Aff. (Exhibit E) at ¶ 16.  Although she was a paralegal, her superior knowledge of real estate closing law and of the documents and issues in the case, and the forceful nature of her personality, cemented for her a far more prominent role than a paralegal would ordinarily have on a defense team.  Id. at ¶ 15.

Thus, when Abbruzzese discussed with her boyfriend McGonagle confidential information about the case, she was in a position to breach very significant confidences that were central to Mr. Levine's defense.  Examples of such inappropriate discussions of confidential trial issues have already been documented.  One such example was Ford's testimony concerning the

email Abbruzzese sent McGonagle about "Team Levine" having to take her off the case for financial purposes.  See § IV(A), supra.  A second example was the discussion between them revealed to the Court by Attorney Borenstein and AUSA Wild on May 19 about whether or not Levine would be testifying, a subject that – given the true nature of their relationship – appeared likely to have gone well beyond merely parroting the defense witness list.

A third such example of Abbruzzese and McGonagle freely discussing trial issues and confidential information was graphically related by Ford.  Towards the end of the trial, in May he believed, on a Friday after the trial had ended for the day, Abbruzzese told Ford that she had learned there was going to be a surprise in court on the following Monday: A codefendant of Levine's was going to "flip" on him, i.e. plead guilty and potentially testify against him. 8/31 Ford Tr. (Exhibit F) at 58-60.  After initially saying it was his impression that she had gotten this information from the federal agent, but that she had not expressly said that, Ford's review of his prior, unsworn testimony of July 22 refreshed his memory that Abbruzzese told him "it was Federal Joe who told her about the surprise."  Id. at 61.  It should be noted that this "surprise" never came about.  But what is important here is not whether or not the "flip" actually occurred; rather, what is striking is the cavalier exchange of such delicate and sensitive information between Abbruzzese and McGonagle.

The day after Abbruzzese quit, Ford finally "came clean" with Feretra, telling him that Abbruzzese had been cheating on him, seeing a federal agent on the case, and that Ford had lied to Feretra various times on her behalf.  Id. at 86-87.  Ford testified that Feretra "knew of the federal agent quite well," and that Ford had witnessed conversations between Abbruzzese and Feretra concerning the agent.  Id. at 87.  Ford believed she was truthful with Feretra at the very

beginning of her relationship with McGonagle.  Id. at 87-88.  But beyond that, "I don't know if it

was sexy to her to tell this guy that she was being courted by a federal agent."  Id. at 88.

Ford's conversation "coming clean" with Feretra was the subject of two voicemail

messages that Abbruzzese left for Ford after she had quit.   Ford received the first message the

day after she quit:

> What it said was, hey, I just got a call from Joe, meaning Joe Feretra,
> I really hope you didn't tell him anything.  He knows an awful lot.
> I don't know, you must have either said something or he is following
> me.  I really hope you didn't say anything, bye.

Id. at 86.  Ford knew that she was referring in this voicemail to the discussion he had when he

"came clean" with Feretra.  Id. at 86.  A couple of days later, at 5:20 am, Abbruzzese left Ford a

"rambling" message in which she was "clearly under the influence."  Id. at 88.  Abbruzzese said,

in relevant part, "I just wanted to let you know that he broke my arm.  It fucking really

hurts...maybe you feel better now that your actions precipitated that."  Id.[16]

## B.   Testimony of Jennifer Garrity

The sworn testimony of Jennifer Garrity, a Legal Assistant and "work friend" of

Abbruzzese's at DP,  8/31 Garrity Tr. (Exhibit B) at 5, 7, corroborated the core testimony of

Ford that, contrary to Abbruzzese's and McGonagle's sworn testimony at the May 19 hearing,

the two of them were involved in a romantic relationship during the Levine trial.  Garrity

testified that Abbruzzese told her about the relationship that she was having with a federal agent

on the Levine case, initially identified as "Joey."  Id. at 10.  Garrity later learned that this agent's

last name was McGonagle.  Id. at  10-11.

---

[16] After requesting these messages from DP, undersigned counsel was advised by DP as of 9/7/10 that they had been
erased.

Garrity recalled the first such discussion about the seriousness of the Abbruzzese-McGonagle relationship taking place after the hearing in which Abbruzzese had to testify about the relationship.  Id.  at 14-16.  She recalled this being in May, id. at 14-15, which she then narrowed to the end of May, id. (the hearing took place on May 19).  "I remember it being the end of May, because we had spoken about her going out on weekends and meeting someone. And she had confided in me that she had to take the stand in front of  a judge and tell the judge that she wasn't discussing the case, the Levine case with this person."  Id. at 15.  Abbruzzese said that Attorney Borenstein (Levine's lead counsel at DP) had told her that he "didn't want her to see him again", id. at 17, and that she was "very upset at her not being allowed or her being told to not see this person anymore."  Id. at  19.  Abbruzzese said something along the lines of "Isaac is not going to tell me who I can f-ing see."  Id. at 19-20.

Garrity had many discussions with Abbruzzese about her relationship with "Joey," the federal agent,  id. at 21, whose appearance she described as "wicked Irish, red hair."  Id. After telling Garrity about the hearing in court, "[w]e would discuss what we had done on the weekends, and she would say, I went out with Joey or I saw Joey and we did this."  Id. at 22. She testified that at the end of May, Abbruzzese told her that she and Joey were sleeping together.  Id. at 27-28.   Some time after the first conversation about their relationship, Abbruzzese told Garrity that "she loved him and they were in love."  Id. at 21-22.  They expressed that love to each other.  Id. at 25-26.

At the end of May or the beginning of June, Abbruzzese told Garrity that she was spending most weekends with the agent and would go to his condo.  Id. at 24.  She said that she slept at  McGonagle's condo in Peabody a lot.  Id. at 29.   When she stayed there on weeknights, sometimes  McGonagle would give her his blue Audi to drive in to work.  Id. at 31.  Garrity said

"I found the key on her desk and I asked her who had an Audi, and she said Joey," and Abbruzzese said that he lent her his car sometimes.  <u>Id.</u>  On other occasions as well Abbruzzese told Garrity that she had driven his car in to work after staying at his place.  <u>Id.</u> at 32.

These sleeping arrangements presented some significant logistical difficulties in light of the fact that Abbruzzese was, at the time, living in Winthrop with her boyfriend, Joe Feretra, to whom she became engaged at some point in time.  <u>Id.</u> at  8-10.  Abbruzzese told Garrity that, when she stayed with McGonagle, "[s]he would mostly tell her fiancée that she was staying with me [Garrity]."  <u>Id.</u> at 30.  That made Garrity  uncomfortable "[b]ecause I don't believe you should cheat on somebody."  <u>Id.</u>  Abbruzzese related other precautions she took as well to try to prevent Feretra from learning of her relationship with McGonagle.  When she stayed at McGonagle's condo on weeknights, if he didn't loan her his Audi to drive to work, he would drive her in himself the following morning.  <u>Id.</u> at 29.  Sometimes she would have McGonagle drop her off away from the office in case Feretra was waiting for her downstairs at her office building.  <u>Id.</u> at 33.  Abbruzzese told Garrity that she wanted to leave Feretra for McGonagle, but didn't know how.  <u>Id.</u> at 30-31.

Abbruzzese also told Garrity that she and McGonagle were together a lot.  <u>Id.</u> at 35. Sometimes she related specific things they did together, for example going to meet McGonagle's sister and brother-in-law, and their son (McGonagle's nephew).  <u>Id.</u> at 24-25.  Abbruzzese also told her one time that they had gone to Marblehead.  <u>Id.</u>  Garrity did not recall when these conversations took place.  <u>Id.</u> at 25.

Abbruzzese expressed concerns to Garrity about anyone finding out about her relationship with McGonagle.  <u>Id.</u> at 42.  She said in substance "it wouldn't be good for anyone

to find out," and  "I don't want anyone to hear about it."   <u>Id.</u> at 43-44.  "[N]o one can  know

about this."   <u>Id.</u> at 42.

The Abbruzzese-McGonagle relationship clearly continued and lasted well beyond the

trial, as well.  Garrity recalled a conversation she had with Abbruzzese while Abbruzzese was

smoking a cigarette on the balcony at DP's office during the week ending Friday, July 16, which

was the week before Abbruzzese quit DP.  <u>Id.</u> at  35-37.  Abbruzzese told her that she and Joey

had gotten into a fight, and she was worried that he was upset with her.  <u>Id.</u> at 37.  She made up

with McGonagle by sending him an email, which Abbruzzese showed to Garrity on the balcony.

<u>Id.</u> at 36-38.  The email from Abbruzzese "was almost like a poem.  I love you when you do this

and I love this about you.  And a list of reasons why she loved him and what he did that she

loved about him."  <u>Id.</u> at 38.  There was a reply on the email from McGonagle, but she didn't

remember what it said.  <u>Id.</u> at 40.  Abbruzzese told Garrity out on the balcony that, "she was so

crazy about him and how much she loved him."  <u>Id.</u> at 41-42.

In a lunchroom conversation the day Abbruzzese quit (July 20 or 21), when a DP

employee said something about allegations that Abbruzzese had been seeing "a fed from

Winthrop," Garrity corrected her by saying "he's from Peabody and her fiancée is from

Winthrop…"  <u>Id.</u> at 49.  Attorney Denner then pulled her out of the lunchroom saying that he had

heard something about the discussion that triggered some concern on his part.  <u>Id.</u> at 54.  Garrity

then told him what she knew about their relationship, based on what Abbruzzese had told her.

<u>Id.</u> at 54-55.  In addition, Ford told Garrity about the voicemail message he had gotten from

Abbruzzese right after she quit.  <u>Id.</u> at  56-58.

### V.  LEVINE IS ENTITLED TO RELIEF UNDER SECTION 2255

**A.    Standard for Ineffective Assistance Claims Arising Out of Actual
       Conflicts of Interest**

In light of their inherent seriousness, ineffective assistance claims that arise out of actual

conflicts of interest require a lesser showing than most ineffective assistance claims.  The general

rule for ineffective assistance claims that do not arise out of actual conflicts has been expressed

by the Supreme Court in these terms:

> "The purpose of the Sixth Amendment guarantee of counsel is
> to ensure that a defendant has the assistance necessary to justify
> reliance on the outcome of the proceeding.  Accordingly, any
> deficiencies in counsel's performance must be prejudicial to the defense…"

Strickland v. Washington, 466 U.S. 668, 692 (1984).

In proving prejudice in such cases, the Supreme Court rejected an "outcome

determinative standard" akin to that for a new trial based on newly discovered evidence.  Id. at

693-94.  Thus, in the ordinary case challenging a conviction on grounds of ineffective assistance

of counsel, to meet the prejudice requirement, "a defendant need not show that counsel's

deficient conduct more likely than not altered the outcome in the case."  Id. at 693.  Rather, in

such cases, "[t]he defendant must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at

694.

There is a subset of ineffective assistance claims, however, in which prejudice is

presumed, and hence even this standard – reduced from that for a new trial based on newly

discovered evidence – is dispensed with.  These involve circumstances in which prejudice "is so

likely that case-by-case inquiry into prejudice is not worth the cost."  Id. at 692.  The actual or

constructive denial of the assistance of counsel altogether, and various types of state interference

with counsel's assistance, are among those which the Supreme Court has identified as presuming

prejudice, and where there has been a breakdown in the adversarial process such that counsel

entirely fails to subject the prosecution's case to meaningful adversarial testing.  Id.; U.S. v.

Cronic, 466 U.S. 648, 659 (1984).

Cases in which "counsel is burdened by an actual conflict of interest" warrant "a similar,

though more limited, presumption of prejudice."  Id.  "In those circumstances, counsel breaches

the duty of loyalty, perhaps the most basic of counsel's duties.  Moreover, it is difficult to

measure the precise effect on the defense of representation corrupted by conflicting interests."

Id.

The rule for such cases involving actual conflicts of interest is "a fairly rigid rule of

presumed prejudice…"  Id.  Nonetheless, it is "not quite the per se rule of prejudice that exists

for the Sixth Amendment claims involving actual or constructive denial of the assistance of

counsel, or certain types of state interference with the assistance of counsel.  Id.  "Prejudice is

presumed only if the defendant demonstrates that counsel 'actively represented conflicting

interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'"

Id., citing and quoting Cuyler v. Sullivan, 446 U.S. 446 U.S. 335, 350, 348 (1980).

 In light of the demonstrated romantic relationship between Abbruzzese and McGonagle

during the trial here, and their discussion of confidential information,  see § IV(A), supra, Mr.

Levine's trial team (led by Isaac Borenstein)  "actively represented conflicting interests."

Strickland, supra at 692.  We now proceed to show that because the conflict was concealed from

Mr. Levine – both by his trial counsel, and by the perjurious testimony of Abbruzzese and

McGonagle at the May 19 hearing - Mr. Levine was deprived of the opportunity to object to the

conflict, or to meaningfully waive it, either before or after the trial began. He was thus required to go through the trial, and pretrial preparation, with the taint of this relationship concealed from him. Accordingly, he is not required to satisfy the "adverse effect" prong of the standard. <u>See</u> Sec. VB., <u>infra</u>. Even if Mr. Levine were still required to show adverse effect, however, he could amply meet that standard. <u>See</u> § VC., <u>infra</u>.

**B.    Levine Was Not Given the Opportunity at or Before Trial to Object to the Conflict, and so He Does Not Have to Show Adverse Effect**

Cases involving allegations of Sixth Amendment violations arising from conflicts of interest have recognized "the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts." <u>Strickland</u>, 466 U.S. at 692, *citing* Fed. R. Crim. P. 44(c). Thus, in a case involving allegations of a conflict arising from multiple representation, the Supreme Court has said:

> "Since a possible conflict inheres in almost every instance of multiple representation, a <u>defendant who objects to multiple representation</u> must have the opportunity to show that potential conflicts impermissibly imperil his right to a fair trial. <u>But unless the trial court fails to afford such an opportunity</u>, a reviewing court cannot presume that the possibility for conflict has resulted in ineffective assistance of counsel."

<u>Cuyler v. Sullivan</u>, 446 U.S. 335, 348 (1980). (emphasis added). Thus, "<u>a defendant who raised no objection at trial</u> must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Id. (footnote omitted; emphasis added).

As has been shown in this case, the defendant Levine was denied the opportunity to object at trial to a conflict of interest arising from the Abbruzzese-McGonagle relationship. He was denied that opportunity in two different ways. First, his trial counsel failed to share with him at all during the trial his belief that Abbruzzese and McGonagle were romantically linked, and his concerns for the effect of that relationship at the trial. 5/19 Chambers Hearing Tr.

(Exhibit D) at 5; Levine Aff. (Exhibit A) at ¶ 14.  And then when Mr. Borenstein finally brought the Abbruzzese-McGonagle relationship to the Court's attention (but not Levine's) at least two weeks after first suspecting it, and the court held an evidentiary hearing, Abbruzzese and McGonagle both perjuriously denied any romantic involvement.  5/19 Chambers Hearing Tr. (Exhibit D) at pp. 24, 28-30.  These answers by both were made in response to perfunctory and non-adversarial questioning.  Id.  After the hearing, Mr. Levine's attorneys summarized this testimony for him (as Mr. Levine was not present at the closed hearing).  Levine Second Aff. (Exhibit E) at ¶ 3.  Mr. Levine relied on the perjurious testimony in believing that no relationship existed, thus he had no basis for objecting, and did not object.  Id. at ¶¶ 11-13.  Had Levine known the truth at the time of this evidentiary hearing about the relationship, or the basis for it, he would have vigorously objected to the continuation of the trial with conflicted counsel.  Id. at ¶ 13.

The circumstances of this case effectively prevented the trial court from conducting the early inquiry into a conflict that the Supreme Court emphasized in Strickland, 466 U.S. at 692. Although such an inquiry was ultimately made, it was not made early, and it resulted in the protagonists, including a federal agent, actively concealing and covering up the conflict by lying about it.  Thus, it was the functional equivalent of no inquiry.

Similarly, Levine theoretically had an opportunity to object to the trial team continuing despite a conflict, and a chance to waive his right to conflict-free counsel.  But those rights were eviscerated by the cover-up by his counsel, and the perjury of McGonagle and Abbruzzese that preceded them; events that prevented a meaningful exercise of rights or a knowing and intelligent waiver.

It is important to review the timeline to see the extent of knowledge of this relationship that existed at Denner Pellegrino.  Mr. Ford traces his knowledge of it back to March, 2010, the month before the trial started,  when he saw the email exchange between Abbruzzese and McGonagle at Feretra's apartment.  8/31 Ford Tr. (Exhibit F) at 16-31.  In his comments at the May 19 hearing, Mr. Borenstein said that he had told Abbruzzese a couple of weeks earlier that her relationship with McGonagle was "not appropriate," and that she should "stop that."  5/19 Chambers Hearing Tr. (Exhibit D) at 5.  Thus, his knowledge of the relationship extended back at least to early May.

Yet no one told Mr. Levine about this relationship, whether in March or early April, after the trial started, or even on May 19, 2010 when the relationship was brought to the attention of the Court but not to Levine.  Levine Second Aff. (Exhibit E) at ¶ 9.  No one  told Mr. Levine anything  about Mr. Borenstein's confrontation with Abbruzzese in early May about the relationship.  Id. at ¶ 6.  No one told Mr. Levine anything about the discussion between Abbruzzese and McGonagle on the evening of May 18.  Id. at ¶ 4.   No one told Mr. Levine about the angry  discussion between Mr. Borenstein and Abbruzzese in the lobby of Denner Pellegrino's building on the way to court on May 19 – a confrontation that was serious enough to be reported to building management and Denner Pellegrino management.  Id. at ¶ 7.   Mr. Levine was not present in the chambers for the closed hearing  later that day at which Mr. Borenstein described to the court the two confrontations with Abbruzzese, and Mr. Borenstein did not at that, or any other, time,  describe those to him.  Id. at ¶ 8.  Mr. Borenstein told Mr. Levine only that there had been an exchange of email between Abbruzzese and someone that had caused Mr. Borenstein some concern of an unidentified nature.  Id. at ¶ 5.   And any opportunity during the trial for Mr. Levine to learn of that relationship was doomed by the perjurious testimony of the

two protagonists; testimony (denying any out of court relationship) which was summarized to Mr. Levine following the hearing. Id. at ¶ 3.

Thus, as of this May 19 hearing, Mr. Levine appears to be one of the few people involved in the case who was not aware of the Abbruzzese-McGonagle relationship, and of the strong signs pointing to it notwithstanding their denials under oath. Mr. Levine only learned of Mr. Borenstein's May 19 in chambers description to the Court of his belief going back to early May that they were involved in an inappropriate discussion on May 18 when the sealed transcript of the May 19 hearing was unsealed in August, 2010, and he read about it then for the first time. Id. at ¶ 10. If Mr. Levine had known what Ford described of the relationship in March, 2010, before the trial began, he would have asked that the trial date be continued and a full hearing be held to explore the relationship. Id. at ¶ 11. And after hearing evidence of the relationship pretrial, he would have objected to, rather than waived, the conflict, and would have asked that he have an opportunity to hire new counsel. Id. at ¶ 12. Similarly, if he had learned the truth about the relationship on May 19, or any other time after the trial was underway, he also would have objected to, rather than waived, the conflict, and would have requested that the trial be suspended, or a mistrial declared, so that he could get new counsel unencumbered by this conflict. Id. at ¶ 13.

This case is thus markedly different from the typical conflict of interest case, in which the conflict is known to the defendant and he has an opportunity to make a knowing and intelligent waiver of the conflict. Here Mr. Levine's own counsel concealed the relationship from him, and McGonagle and Abbruzzese exacerbated that concealment by lying about it under oath. Furthermore, one of the perjurers was a government agent who was part of the government trial team, elevating the situation to one involving governmental misconduct by that agent. Such

serious governmental misconduct should be deterred and penalized by appropriate sanctions tailored to the particular case.  Because of the seriousness of this governmental misconduct, and its direct effect in depriving Mr. Levine of his Sixth Amendment rights,  such sanctions should remedy the constitutional violation they brought about, and Mr. Levine should not have to jump through "adverse effect" hoops in order to trigger them.

For this aggregation of reasons this case falls outside the scope of conflict cases requiring the defendant to prove that the conflict adversely affected Mr. Levine's representation.  This combination of misconduct served to deprive Mr. Levine of his fundamental right under the Sixth Amendment to proceed with conflict-free counsel on a trial where most of the balance of his life was at stake**.**  The case thus falls well outside the parameters of the "adverse effect" cases, and is instead comparable to the category of cases in which a trial court "fails to afford" a defendant an opportunity to demonstrate how a conflict imperils his right to a fair trial, Cuyler, 446 U.S. at 348.  Due to the concealment of his own counsel, and the perjury of the government agent and a critical member of his trial team, Mr. Levine was not permitted the opportunity to raise an objection to the representation, either before or at trial.  Id.  Thus, he is relieved of the burden of demonstrating that the "actual conflict of interest  adversely affected his lawyer's performance."  Id.

### C.     Even If He Were Required to Prove Adverse Effect, Levine Could Satisfy that Burden

It has been noted, in a similar case involved a one-night romantic relationship between a prosecutor and the defense lawyer, "the simple failure timely to disclosure a conflict and to ask to be removed cannot without more be itself the above effect under Cuyler …"  Summerlin v. Stewart, 267 F.3d 926, 939 (9th Cir. 2001) (emphasis added).  The present case supplies "the more," however, in the form of perjured testimony of both the representative of the defense team

and the federal agent.  This perjury – a product of the conflict of interest – created adverse effects of a constitutional dimension on Mr. Levine's representation.  It prevented the judge from taking appropriate steps to protect Mr. Levine's constitutional interests in the middle of trial.  It prevented Mr. Levine from objecting to the continuation of the trial with tainted, conflicted counsel.  And it further prevented Mr. Levine from making a knowing and intelligent waiver of his constitutional right to conflict-free counsel.  The conflict of interest triggered the perjury, which in turn generated these adverse constitutional effects on Mr. Levine's representation.

"In those cases where the potential conflict is in fact an actual one, only inquiry will enable the judge to avoid all possibility of reversal by either seeking waiver or replacing a conflicted attorney.  Mickens v. Taylor, 535 U.S. 162, 173 (2001).  The perjury of Abbruzzese and McGonagle foreclosed such appropriate inquiry, and prevented either the waiver or replacement remedy from being imposed.  This constitutes the requisite "proof of effect upon representation" to trigger the presumption of prejudice.  Id.

Besides this fundamental adverse effect of forcing him to be defended at trial (and before) by conflicted counsel, the Abbruzzese-McGonagle relationship, and the conflict of interest it spawned, had additional adverse effects on Mr. Levine's representation.  As noted above, although she was not an attorney - a fact learned by Levine only at the beginning of trial, Levine Aff. (Exhibit A) at ¶ 8 – Abbruzzese played a critical role on the Levine defense team.  She was the most knowledgeable and experienced in real estate closings and real estate practice.  Levine Second Aff. (Exhibit E) at ¶ 15.  She was by far the most familiar with real estate documents and required documentation.  Id.  Levine had known her years back from her work at a closing firm.  Levine Aff. (Exhibit A) at ¶ 2.  He had great confidence in her ability and experience, and thus relied greatly on her.  Id.  From approximately  October, 2009 through the

end of March or April, 2010, he exchanged emails with her on virtually a daily basis regarding

the trial and trial preparation.  Levine Second Aff. (Exhibit E) at ¶ 17.  And until approximately

the end of March or April, his faith in her was rewarded, as she proved, up to that point, to be

able, diligent, and reliable in performing tasks assigned to her for trial preparation.  Id. at ¶ 18.

But somewhere around the end of March or April, all that changed.  Id. at ¶ 19.  That

change corresponded approximately with the onset of her relationship (unknown to Levine at the

time) with McGonagle.  Id.  After that time, two things happened.  First, she was intermittently

pulled off the case by Denner Pellegrino.  Id. at ¶ 20.  Attorneys at Denner Pellegrino - and

Abbruzzese herself in her email to McGonagle which Ford saw - cited "financial reasons" for

pulling her off the case.  Id. at ¶ 21.  But in fact, this proffered explanation was a mere pretext,

apparently to cover up knowledge within Denner Pellegrino of the inappropriate relationship.

There were no financial reasons to pull her off the case, as the fee arrangements with Denner

Pellegrino had been well-established with Levine, and Levine had fully complied with securing

his obligations to the firm.  Id. at ¶ 22.  Because the "financial" explanation rings false, it is

reasonable to attribute Abbruzzese's periodic removals from the case to other, genuine reasons,

including the knowledge or concern of attorneys of the firm that she was engaged in the

relationship with McGonagle, and hence should be pulled off the case.  Id. at ¶ 23.  This

knowledge or concern was gained by at least certain Denner Pellegrino personnel (Ford) as early

as March, 2010, before the trial began,  8/31 Ford Tr. (Exhibit F) at 11, and by Mr. Levine's trial

team by early May at the latest.

And so, upon information and belief because of concerns about Abbruzzese's relationship

with McGonagle, she was periodically pulled off the case, to the great detriment of the defense.

Indeed, her imminent removal of the case, albeit ostensibly for "financial" reasons, was the

subject of the emails between Abbruzzese and McGonagle that Ford saw in March. Id. at 17.

Abbruzese's concerns expressed in March to McGonagle that she would be pulled from the case,

and their mutual forebodings at not being able to see each other in court, id. at 21, proved

accurate. As she warned McGonagle would happen, Abbruzzese was pulled off the case for

certain critical periods of time shortly before trial, and during trial, leaving Levine's trial team

without its most knowledgeable person concerning real estate closings, and its point person in

obtaining and organizing documents. Levine Second Aff. (Exhibit E) at ¶ 15.

The second thing that happened concurrent with Abbruzzese's engaging in the

relationship with McGonagle was that Abbruzzese's performance during the periods when she

was not pulled off the case diminished dramatically. Id. at ¶ 24. Whether this was because of

divided loyalties on her part, or because she was diverted and distracted from her duties by her

newfound relationship with McGonagle, is not known, and need not be shown by Levine to

prevail on this motion. But the fact of the matter is that from approximately the end of March or

April on, the previously diligent and reliable Abbruzzese became scattered, unreliable, and far

more detached from the case. Id. at ¶ 25. Her attention to detail waned drastically. Id. And her

previous daily email communication with Levine in connection with the trial and trial

preparation was greatly reduced. Id. It is reasonable to infer that this dramatic change –

occurring as it did concurrently with the development of her relationship with McGonagle – was

related to that relationship, and reflected divided loyalties on her part.

This confluence of events beginning shortly before trial and continuing into trial -

Abbruzzese's romantic entanglement with McGonagle, the concealment of that relationship

from Levine, both by his trial counsel and by the perjurious testimony of Abbruzzese and

McGonagle, Abbruzzese's removal from the trial team for periods of time (apparently due to

the relationship), and her greatly subpar performance during the periods she remained on the case, and was involved with McGonagle - had serious repercussions for Mr. Levine at trial. They resulted in numerous viable defense strategies or tactics which Mr. Levine's trial team failed to pursue because of Abbruzzese failing to perform specific trial tasks she was supposed to perform, such as compliance with pre-trial orders regarding notice to the government of intended witnesses and exhibits, obtaining documents and issuing subpoenas.  Her failure to perform these tasks prevented these defense strategies from being employed and/or significant defense theories from being adequately advanced.  These lost opportunities, which we will now review, were the fruit of the relationship which tainted Levine's trial team and deprived Levine of his right to conflict-free representation, and they adversely affected his defense at trial.

The first of these missed opportunities was the failure of the Levine trial team to use certain critical documents that the government had obtained in its investigation and had stored at a U.S. Post Service facility under McGonagle's supervision.  Levine Second Aff. (Exhibit E) at ¶ 27.  Mr. Levine spent considerable time reviewing these documents with Ms. Abbruzzese, under McGonagle's watch, and he flagged for copying by McGonagle documents that were important to his defense.  Id. at ¶ 28.  It was Abbruzzese's job to get these documents from McGonagle, prepare them for use at trial, list them as defense exhibits, and give proper notice to the court and the government of the intent to offer them as exhibits at trial.  Id. at ¶ 29.  Her failure to perform these tasks prevented these documents from being used at trial by the defense, and prevented significant defense theories from being adequately advanced.  Id. at ¶ 31.  Examples of such documents included the following:

(1)     Documents Seized from Lamerique - The government had seized documents from Andre Lamerique, a co-defendant who pled and cooperated with the government, and was the

most critical witness at trial against Levine and the remaining co-defendants.  Id. at ¶ 32.   These
included applications for driver's licenses,  driver's licenses, names and addresses, social
security numbers,  software used to create the phony documents,  W2s, employment letters, bank
statements, and other information used to create phony identification for imposters and straw
buyers who Lamerique knew were brought to closings to pose as buyers.  Id. at ¶ 32.  The
importance of this information was two-fold.  First, it showed that Lamerique, and not Levine,
was in control of, and knew of the use of, imposters and straws using phony identification and
documents at closings, and that it was Lamerique who controlled, planned, and masterminded the
use of imposters with phony documents at closings (unbeknownst to Levine).  And secondly,
these documents could have been used to impeach Lamerique's credibility when he denied using
imposters at the closing.  Abbruzzese's failure to timely obtain and give notice of these
documents helped prevent their use in this fashion.  Id. at ¶ 36.  It also helped prevent effective
cross examination of Lamerique to show he had stolen the software used to create the imposters'
documents.  Id.

Also significant were documents from the government investigation under the control of
McGonagle that were maintained in the same location as the Lamerique documents relating to
the property at question at trial located at 7 Claridge Terrace, Dorchester.  Id. at ¶ 34.  Also
unbeknownst to Levine, the resale buyers of that property were imposters.  Id. at ¶ 35.  These
documents proved the buyers were imposters who used stolen identities.  Id.  Abbruzzese failed
to ensure timely notice of these documents to the government so that they could be used at trial.
Id. at ¶ 36.  But even more fundamentally, she neglected to subpoena as a defense witness Scott
Fitzgerald, who was the closing attorney at the resale closings on that property.  Id. at ¶ 37.  Not
only could Fitzgerald have authenticated the documents as those used at the closing, but even

more fundamentally, he would have testified that as the closing attorney who reviewed the

documents ahead of time and/or at the closing, he had no idea that they were phony or that the

buyers were imposters.  Id. at ¶ 38.  Fitzgerald would have served as a proxy for Lindley and

Levine, demonstrating to the jury that,  in occupying roles similar to those of Levine and Lindley

in the transactions in question, like them,  he had no way of knowing the documents were phony

or the buyers were imposters, and he believed in good faith that the closing was lawful and

legitimate.[17]  Abbruzzese's failure to get the documents listed on an exhibit list in timely fashion,

and her failure to subpoena Fitzgerald, prevented this important defense theory from being

properly advanced.  Id. at ¶¶ 36, 41.

(2)      Second Sets of  Closing Documents -  One of the recurring themes the

government articulated against Levine was his role in setting up a second closing for the

properties in question in which a second set of forged closing documents was used.  But among

the documents seized from Lamerique were documents that demonstrated he was the one who

created the extra sets of documents.  Thus, among the documents that Levine and Abbruzzese

flagged for use at trial when they reviewed them under McGonagle's watch at the U.S. Postal

Service office in Boston were, for different properties, including some of the properties in the

indictment, two sets of HUD-1s,  purchase and sale agreements, and offers.  Id. at ¶ 42.  These

came from Lamerique's files, not Levine's.  Id. at ¶ 43.  But because Abbruzzese didn't list them

properly or timely on the defense exhibit list, they were unable to be used to show that

---

[17] Abbruzzese also failed to subpoena other closing attorneys who could have offered valuable testimony for the
defense.  Levine Second Aff. (Exhibit E) at ¶ 39.  Testimony from such closing attorneys could have included the
fact that there was no "bump" in the purchase price of many properties, and that all documents were maintained in
the closing files, even those the government claimed at trial were highly incriminating.  Id. One such closing
attorney who Ms. Abbruzzese was responsible for subpoenaing, and who could have provided such testimony, was
Attorney McDevitt.  Id. at ¶ 40.  However, because she served the subpoena late (the day before his testimony was
needed), he was in Las Vegas and unavailable.  Id.

Lamerique, not Levine, was the person responsible for these extra sets of closing documents, and to impeach Lamerique's credibility.  Id. at ¶ 44.

(3)     Building Permits -  Mr. Levine printed out from the City of Boston website all the building permits on the Boston properties that were the subject of the trial, and gave them to Abbruzzese.  Id. at ¶ 45.   He instructed her to get them certified so they could be offered into evidence.  Id. at ¶ 46.   He also instructed her to subpoena the building permits from Quincy, Brockton, and Cohasset, which were also involved in the trial.  Id. at ¶ 47.   However, she failed to subpoena the building permits from these other municipalities.  Id. at ¶ 48.   And she did not itemize these building permits as separate exhibits on the defense witness list.  Id.

The result of these failures was that improper notice was given to the government of the intent to offer these permits, and they were excluded.  Id. at ¶ 49.  This had serious consequences for Mr. Levine's defense, because the building permits would have helped prove that renovations were actually planned on the properties, and that they matched renovations that were listed as necessary in appraisals of the properties.  Id. at ¶ 50.  Thus, the extra money that was generated at the closings (referred to as the "bump") was not generated as profits for the benefit of Levine and some of his co-defendants, as the government and Lamerique contended.  Id.   Rather, it was intended as money to go to contractors, to do the actual needed renovations, which, contrary to Lamerique's testimony, was done on many properties.  Id.  This was consistent with the defense theory that real buyers were actually making mortgage payments on the properties, and that these were legitimate, rather than sham, transactions.  Id.  And the availability and use of these documents would have helped counter the government's position that sellers of some of the properties were duped on the cash back.  Id.  Similarly, the construction contracts would also have legitimized the money going back to the buyer or seller at the closings as earmarked for

actual renovation or construction work.  Id. at ¶ 51.  But Abbruzzese's failures to timely list these

exhibits thwarted their use and prevented this argument from being made effectively.

(4)     Graham Complaint - Before trial Mr. Levine asked Abbruzzese to get, and

prepare to use at trial, a certified copy of the Verified Complaint in the case of Norma Graham v.

Daniel Lindley, Ames Mortgage, et al., Suffolk Superior Court.  Levine Second Aff. (Exhibit E)

at ¶ 52.  The complaint related to the property in question at trial located at 117-119 Vera Street.

Id., at ¶ 53.  However, Abbruzzese did not have the Complaint in court and ready to use when

needed, which prevented its use.  Id. at ¶ 54.

The reason Mr. Levine wanted to use the Verified Complaint was to show that, contrary

to Lamerique's assertions, this was a legitimate transaction.  Id. at ¶ 55.  Ms. Graham was a

legitimate buyer , rather than a straw or imposter, who intended to live, and did live, in the

property, and who, through this Complaint, was fighting foreclosure.  Id. at ¶ 56.  These

elements counter the conspiracy laid out by Lamerique and the government, which rested on the

notion that the transactions were sham, the buyers were straws or imposters who would not live

in the property or make payments on it, and the defendants would allow the property to go to

foreclosure.  Abbruzzese's failure to have this Verified Complaint ready to use at trial deprived

Mr. Levine of this showing.

Mr. Levine reviewed the importance of these documents with Ms. Abbruzzese well

before trial.  Id. at ¶ 57.  The documents were especially critical to these defense theories because

Mr. Levine, on advice of counsel – including, especially that of Ms. Abbruzzese – did not testify.

Id. at ¶ 58.  In deciding to acquiesce in Abbruzzese's strong recommendation that he not testify,

Levine took into consideration that many documents of the type described above, including

building permits and construction contracts, would be used as defense exhibits, and certain

defense witnesses would be called, to provide evidence in lieu of his testimony.  <u>Id.</u> at ¶ 59.  It was Abbruzzese's responsibility on behalf of the defense team to get these documents copied and to obtain them from the government in time for use at trial, and to subpoena the witnesses.  <u>Id.</u> at ¶¶ 29, 37.  And it was McGonagle, on behalf of the government, who had custody of the documents and was responsible for copying them and getting them to the defense in time to use at trial.  <u>Id.</u> at ¶ 30.

Despite the demonstrated importance of these documents, however, they were not copied by the government or received by the defense in time for use at trial.  <u>Id.</u> at ¶ 60.  They were not received by the defense until the Friday (4/1/10) before the trial started (4/4/10).  <u>Id.</u>  When the defense sought to use them, the Court sustained the government's objection that they had not been included on the defense exhibit list in a timely fashion, and thus they were excluded.  <u>Id.</u> at ¶ 61.  And the witnesses could not be called because they were not subpoenaed or disclosed properly.  <u>Id.</u> at ¶ 62.

Each of these instances, standing alone, is sufficient to warrant a finding that the actual conflict arising out of the McGonagle-Abbruzzese relationship adversely affected Mr. Levine's representation.  Taken cumulatively, they show that Mr. Levine's representation was tainted such that he is entitled to post-conviction relief.

## VI. <u>CONCLUSION</u>

Since his trial, Eric Levine has obtained new evidence which demonstrates that a key member of his defense team and the U.S. Postal Service agent assisting the government in its investigation, preparation, and presentation of the case against him at trial, were involved in a romantic relationship during the trial, and his trial team concealed and covered-up from Mr. Levine their knowledge of this throughout the trial.  Furthermore, the evidence suggests quite

strongly that they both lied under oath when confronted with questions about their relationship on May 19.  Their perjurious testimony constituted a fraud on the court, preventing the court from making further inquiry and taking appropriate and timely action to protect Levine's rights and preserve the integrity of the trial, and preventing Mr. Levine from taking voluntary and knowing action to protect his interests based on a truthful factual record.  Mr. Levine was further prevented from taking such action by his own trial counsel intentionally failing to disclose to him his belief that Abbruzzese and McGonagle were involved in a romantic relationship, and the basis for that belief.

It also appears that Abbruzzese and McGonagle engaged in  inappropriate communications of privileged and confidential information during the trial, and it may be inferred that the three known instances of such communication are the mere tips of the proverbial iceberg.  Their willingness to apparently lie about the core issue of the extent of their relationship casts serious doubt on their credibility and on the truthfulness of the rest of their testimony.

As noted repeatedly by government counsel, the purpose of the May 19 hearing was to "protect the integrity of the proceedings."  5/19 Chambers Hearing Tr. (Exhibit D) at 18, 32, 9. Because the witnesses appear to have testified falsely, however, and the court, the defendant, and the government all relied on those false answers, the questioning subverted, rather than preserved, such integrity.  To restore that integrity, Mr. Levine's sentence must be vacated and set aside, and a new trial conducted in which his right to conflict-free counsel is vindicated.

Respectfully submitted,

ERIC L. LEVINE,
By his attorneys,


 _/s/    Bruce A. Singal_
Bruce A. Singal (BBO #464420)
Michelle R. Peirce (BBO#557316)
DONOGHUE, BARRETT & SINGAL, PC
One Beacon Street
Boston , MA 02108
(617) 720-5092

Dated:   April 16, 2011

## CERTIFICATE OF SERVICE

I, Bruce A. Singal, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants, on this 16th day of April, 2011.


 _/s/    Bruce A. Singal_
Bruce A. Singal